**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| JANE DOE (T.W.), AN INDIVIDUAL, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO: |
| JRD PARTNERSHIP D/B/A MOTEL 6; G6 HOSPITALITY, LLC; G6 HOSPITALITY FRANCHISING, LLC; G6 HOSPITALITY IP, LLC; G6 HOSPITALITY PROPERTY, LLC; G6 HOSPITALITY PURCHASING, LLC; MOTEL 6 OPERATING, LP; OM NAMAH SHIVAY CLARKSVILLE, LLC D/B/A DAYS INN; WYNDHAM HOTELS AND RESORTS, LLC; SHRI MAHAVIRA CLARKSVILLE, INC. D/B/A DAYS INN; SHREE MAHAVIRA, LLC D/B/A DAYS INN; | |
| Defendants. | |

## ORIGINAL COMPLAINT

Plaintiff Jane Doe (T.W.) files this Original Complaint against JRD Partnership d/b/a Motel 6; G6 Hospitality, LLC; G6 Hospitality Franchising, LLC; G6 Hospitality IP, LLC; G6 Hospitality Property, LLC; G6 Hospitality Purchasing, LLC; Motel 6 Operating, LP; Om Namah Shivay Clarksville, LLC d/b/a Days Inn; Days Inns Worldwide, Inc.; Wyndham Hotels and Resorts, LLC; Shri Mahavira Clarksville, Inc. d/b/a Days Inn; Shree Mahavira, LLC d/b/a Days Inn; as Defendants and respectfully shows the Court as follows:

1

# SUMMARY

1.      Jane Doe (T.W.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at Motel 6 and Days Inn; owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

6.     As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (T.W.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (T.W.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

7.     Plaintiff Jane Doe (T.W.) is a resident of Casselberry, Florida.

8.     Jane Doe (T.W.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

9.     The trafficking of Jane Doe (T.W.) occurred in or affected interstate commerce.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (T.W.).

11.     G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. G6 Hospitality, LLC may be served through its registered agent for service: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as ("G6 Hospitality"). through the Motel 6 franchising system.

12.     G6 Hospitality Franchising, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. G6 Hospitality Franchising, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as ("G6 Hospitality Franchising"). through the Motel 6 franchising system.

13.     G6 Hospitality IP, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Defendant G6 Hospitality IP, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as ("G6 Hospitality IP"). through the Motel 6 franchising system.

14.     G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. G6 Hospitality Property, LLC may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as ("G6 Hospitality Property"). through the Motel 6 franchising system.

15.     G6 Hospitality Purchasing, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. G6 Hospitality Purchasing, LLC may be served

through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as "G6 Hospitality Purchasing"). through the Motel 6 franchising system.

16.     Motel 6 Operating, LP is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas. Motel 6 Operating LP may be served through its registered agent: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter known as "Motel 6 Operating"). through the Motel 6 franchising system.

17.     G6 Hospitality, LLC; G6 Hospitality Franchising, LLC; G6 Hospitality IP, LLC; G6 Hospitality Property, LLC; G6 Hospitality Purchasing, LLC; Motel 6 Operating, LP are referred to collectively as the "Motel 6 Franchisor Defendants."

18.     JRD Partnership is a for-profit corporation with its principal place of business in Clarksville, Tennessee. JRD Partnership may be served at: 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Motel 6 through the G6 franchising system. JRD Partnership may be referred to as "JRD Partnership" or as "Motel 6 Franchisee Defendant."

19.     Wyndham Hotels and Resorts, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Wyndham Hotels and Resorts, LLC may be served through its registered agent for service: Corporate Creations Network Inc., 205 Powell

5

Pl., Brentwood, Tennessee 37027. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Days Inn located at 1100 Hwy 76, I-24, Clarksville, Tennessee 37043 (hereinafter known as "Wyndham") through Wyndham franchising system.

20.     Om Namah Shivay Clarksville, LLC d/b/a Days Inn is a for-profit Tennessee corporation with its principal place of business in Clarksville, Tennessee. Om Namah Shivay Clarksville, LLC d/b/a Days Inn may be served through its registered agent for service: Hiren Patel, 1100 Hwy 76, Clarksville, Tennessee 37043. Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed Days Inn through the Wyndham franchising system. Om Namah Shivay Clarksville, LLC d/b/a Days Inn may be referred to as "Om Namah Shivay" or as "Days Inn Franchisee Defendant."

21.     Shri Mahavira, LLC d/b/a Days Inn is a for-profit Tennessee corporation with its principal place of business in Clarksville, Tennessee. Shri Mahavira Clarksville, Inc. d/b/a Days Inn may be served at 1100 Hwy 76, Clarksville, Tennessee 37043. Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed the Days Inn through the Wyndham franchising system. Shri Mahavira Clarksville, Inc. d/b/a Days Inn may be referred to as "Shri Mahavira" or as "Days Inn Franchisee Defendant."

22.     Shree Mahavira, LLC d/b/a Days Inn is a for-profit Tennessee corporation with its principal place of business in Clarksville, Tennessee. Shree Mahvira, LLC d/b/a Days Inn may be served at 1100 Hwy 76, Clarksville, Tennessee 37043. Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed the Days Inn through the Wyndham franchising system. Shree Mahavira, LLC d/b/a Days Inn may be referred to as "Shree Mahavira" or as "Days Inn Franchisee Defendant,"

23.     Om Namah Shivay Clarksville, LLC; Shri Mahavira Clarksville, Inc.; and Shree Mahavira, LLC are referred to collectively as the "Days Inn Franchisee Defendants."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.      Jane Doe (T.W.) was a victim of unlawful sex trafficking at Motel 6 and Days Inn hotels owned, operated, managed, and controlled by Defendants.**

26.     From approximately April 2011 through October 2014 Jane Doe T.W. was repeatedly trafficked, often for days at a time, at the Motel 6 located at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee; and the Days Inn located at 1100 Hwy 76, I-24, Clarksville, Tennessee.

27.     T.W. met her trafficker, Bobby Ward, through Facebook, who offered her a housekeeping job.

28.     T.W.'s trafficker used force and threats to force and coerce her into sex trafficking including pulling her hair and threatening her family.

**A.  Jane Doe T.W.'s Trafficking at Motel 6**

29.     Between April 2011 and October 2014, Jane Doe (T.W.) was trafficked at Motel 6.

30.     Jane Doe T.W.'s sexual exploitation repeatedly occurred in rooms of the Motel 6 and was facilitated by Motel 6 Franchisor Defendants and JRD Partnership.

**B.  Jane Doe T.W.'s Trafficking at Days Inn**

31.     Between April 2011 and October 2014, Jane Doe (T.W.) was trafficked at Days Inn.

7

32.     Jane Doe T. W.'s sexual exploitation repeatedly occurred in rooms of the Days Inn and was facilitated by Wyndham and Days Inn Franchisee Defendants.

## II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem

33.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe T.W.

34.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of the commercial exploitation of children.[5]

35.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project,

---

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

8

the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

36.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, of which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals showing signs of physical abuse, restraint, and/or confinement;

- Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lacking freedom of movement or are constantly monitored;

- Individuals avoiding eye contact and interaction with others;

- Individuals having no control over or possession of money or ID;

- Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals having few or no personal items—such as no luggage or other bags;

- Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appearing to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.[7]

37.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

38.     The most effective weapon against sexual exploitation and human trafficking is education and training.[8] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[9]

39.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[10] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

---

[7] *Id.*
[8] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[9] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[10] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

10

40.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

41.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

  a.  On January 16, 2020, G6 issued a press release titled "Motel 6 Expands Human Trafficking Awareness and Prevention Efforts through Partnerships with Truckers Against Trafficking and New Friends New Life".[11]

  b.  On the G6 website, in a section, titled "Our Efforts To Prevent Human Trafficking" they state: "There is nothing more important to our company than the safety and well-being of our guests, our franchise owners, and the communities in which we operate. Motel 6 and Studio 6 hotels implement a variety of practices that help to prevent human trafficking through enhanced safety and security procedures; employee and franchise education, training and response; and partnerships and advocacy." They further state "*G6* condemns all forms of human trafficking. Trafficking of

_____

[11] https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/ (last visited June 23, 2023)

people violates basic human rights and constitutes a global societal problem in which multiple stakeholders must partner to eradicate this problem. G6, with a focus on its Motel 6 and Studio 6 brands, takes a proactive, zero-tolerance stance on human trafficking."[12]

42. Each of the Franchisor Defendants and Franchisee Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

43. Unfortunately for Jane Doe T.W., the promises made by the Franchisor Defendants and Franchisee Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe T.W.

## III. Sex Trafficking Has Long Been Prevalent at the Franchisor Defendants' Branded Properties, and They Have Known About It.

44. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe T.W.'s trafficking, that sex trafficking was ongoing and widespread at its branded properties.

45. Upon information and belief, each of the Franchisor Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe T.W. was trafficked. Upon information and belief, each of the Franchisee Defendants monitored criminal activity occurring at the hotels they operated and other areas hotels and were aware of activity indicating commercial sex trafficking or related crimes.

---

[12] https://g6hospitality.com/about-us/combating-human-trafficking/ (last visited June 23, 2023)

12

**A. The use of Motel 6 Franchisor Defendants' properties for sex trafficking is prevalent.**

46.     The use of Motel 6 for sex trafficking is well known to Motel 6 Franchisor Defendants. Information that has become public through news stories establishes the entrenched and pervasive nature of Motel 6 Franchisor Defendants role in providing a venue where sex trafficking has continued unabated for years.

47.     Scores of news stories from across the United States highlight Defendants' facilitation of such conduct, and certainly establishes that Defendants knew, or should have known, of the use of its hotels for sex trafficking. Among notable press involving the frequent use of Motel 6 Franchisor Defendants branded properties for illegal activity, the following was noted:

- "Feds: Man recruited foster care girls for prostitution"[13]

- "Prostitution sting leads to 2 human trafficking arrests in Tulsa"[14]

- "Mentor Police: Prostitute Ran Massage Parlor at Hotel"[15]

48.     These and other news stories show that the use of Motel 6 Franchisor Defendants branded properties for sex trafficking was not isolated to one Motel 6 Franchisor Defendants branded property or geographic area and the common use of Motel 6 Franchisor Defendants branded properties for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

**B. The use of Wyndham properties for sex trafficking is prevalent.**

49.     The use of Days Inn for sex trafficking is well known to Wyndham. Information that has become public through news stories establishes the entrenched and pervasive nature of

---

[13] *Feds: Man recruited foster care girls for prostitution,* News4Jax (July6, 2012). https://www.news4jax.com/news/2012/07/07/feds-man-recruited-foster-care-girls-for-prostitution/ .
[14] *Prostitution sting leads to 2 human trafficking arrests in Tulsa,* KTUL (Aug. 18, 2016), https://ktul.com/news/local/prostitution-sting-leads-to-two-human-trafficking-arrests-in-tulsa
[15] *Mentor Police: Prostitute Ran Massage Parlor at Hotel,* Fox8 (Aug. 3, 2012), https://fox8.com/news/mentor-police-say-prostitute-ran-make-shift-massage-parlor-at-hotel/ .

Wyndham's role in providing a venue where sex trafficking has continued unabated for years. For example:

- "Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution"[16]

- "Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14"[17]

- "Hagerstown man charged with trafficking of two teenage girls"[18]

50.     Reviews of Wyndham's branded properties, which upon information and belief Wyndham monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Wyndham's knowledge of the same. For example:

a. Booking.com review from September 29, 2021, the customer wrote: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[19]

b. Google.com review from 2018, the customer wrote: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[20]

c. Trip Advisor review from June 20, 2014, the customer wrote: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the

---

[16] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

[17] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[18] *Hagerstown man charged with trafficking of two teenage girls,* Herald Mail Media (July 1, 2015)
Hagerstown man charged with trafficking of two teenage girls (heraldmailmedia.com)

[19] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

[20] https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxcCIkbP9h56-kgM4AkAASAHAAQI&ictx=1

hallway and had to intervene when not one other hotel security, management came to help."[21]

**C. The Franchisor Defendants' knowledge of widespread and ongoing sex trafficking at their branded hotels.**

51.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe T.W. was trafficked at their hotel properties, the Franchisor Defendants knew, at least, that:

> a.  There was widespread and ongoing sex trafficking occurring at their branded properties.
>
> b.  Sex trafficking was a brand-wide problem stemming from their top-level decisions.
>
> c.  Their franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.
>
> d.  Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.
>
> e.  They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

52.     Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, the Franchisor Defendants earned revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

**IV.     Sex Trafficking at Motel 6**

> **A.  Motel 6 Franchisor Defendants and JRD Partnership had actual and constructive knowledge of widespread and ongoing sex trafficking at Motel 6.**

---

[21] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

15

53.     Motel 6 Franchisor Defendants and JRD Partnership also knew or should have known about the sex trafficking pervasive at the Motel 6 based on obvious indicators of this activity. Traffickers, including Jane Doe T.W.'s traffickers, repeatedly chose to use the Motel 6 for their sex trafficking activity. Apparent indicia of widespread and ongoing sex trafficking at Motel 6 included:

>     a. There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays.
>
>     b. There was widespread drug trade at the hotel, which is closely linked to human trafficking.
>
>     c. There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution.
>
>     d. Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell.

54.     All knowledge from the staff at Motel 6 is imputed to JRD Partnership. JRD Partnership knew about this widespread and ongoing trafficking at Motel 6, including the trafficking of Jane Doe T.W., through the direct observations of hotel staff, including management-level staff.

**B. The activities of Jane Doe T.W.'s trafficker at Motel 6 were apparent and obvious.**

55.     During the 30-month period that Jane Doe T.W. was trafficked at Motel 6, there were obvious signs that her traffickers were engaged in sex trafficking.

>     a. There was constant and heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had approximately 15 men per day sexually exploiting her at Motel 6.
>
>     b. Men sexually exploiting Jane Doe entered and left her room at unusual times and stayed for brief periods.
>
>     c. Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

16

      d.  Jane Doe's traffickers would decline room service for several consecutive days.

56.    JRD Partnership knew or was willfully blind to the fact that Jane Doe was being trafficked.

57.    Given these obvious signs, Motel 6 Franchisor Defendants knew or should have known about the trafficking of Jane Doe T.W. based on its policy or protocol that required hotel staff to report suspected trafficking.

58.    Motel 6 Franchisor Defendants and JRD Partnership had constructive knowledge of the trafficking of Jane Doe T.W. at Motel 6 because that trafficking was the direct result of Motel 6 Franchisor Defendants and JRD Partnership facilitating trafficking at Motel 6.

**C.  JRD Partnership facilitated the trafficking activity at Motel 6, including the trafficking of Jane Doe T.W.**

59.    JRD Partnership is responsible for the acts, omissions, and knowledge of all employees of the Motel 6 when operating the hotel because these acts and omissions were committed in the scope and course of employment, because JRD Partnership ratified these acts and omissions, and because JRD Partnership failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to JRD Partnership, of human trafficking occurring in the Motel 6.

60.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Motel 6, JRD Partnership continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

61.    JRD Partnership knew or was willfully blind to the fact that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by

providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe T.W.'s sexual exploitation.

62.     JRD Partnership also facilitated widespread trafficking at Motel 6, including the trafficking of Jane Doe T.W., in ways including:

     a.  Accommodating specific requests of the traffickers for room location.

     b.  Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

     c.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

### D. Motel 6 Franchisor Defendants facilitated the trafficking activity at Motel 6, including the trafficking of Jane Doe T.W.

63.     Motel 6 Franchisor Defendants directly participated in and retained day-to-day control over renting rooms at the Motel 6.

64.     Motel 6 Franchisor Defendants directly participated in and retained control over aspects of the operation of Motel 6 related to trafficking.

65.     The relationship between JRD Partnership, as franchisee, and G6, as franchisor, was governed by franchise agreement.

66.     At all material times, G6 had robust reporting requirements in place for its franchisees, such as JRD Partnership.

67.     G6 requires its franchisees, such as JRD Partnership, to report all suspected instances of crime at Motel 6 branded properties.

68.     Based on information observed by the staff at the subject Motel 6, reports should have been made to Defendant G6 about the sex trafficking of T.W.

69.     Therefore, as a result of the strict reporting requirements, at all material times, each and every Defendant knew or should have known of their facilitation of sex trafficking at the Motel 6, including the facilitation of the sex trafficking of T.W.

70.     Defendant G6 exercised pervasive and systematic control of Defendant JRD Partnership regarding the operation of the subject Motel 6.

71.     At all relevant times, Defendant JRD Partnership was subject to and required to comply with franchise agreement standards, policies, and rules adopted by Defendant G6. These standards and policies are detailed and control the specific manner and means by which Defendant JRD Partnership must operate the subject Motel 6.

72.     G6 requires it franchisees, such as JRD Partnership, to report all suspected instances of sex trafficking at Motel 6 branded properties.

73.     G6 requires its franchisee, such as JRD Partnership, to allow G6 to regularly inspect its Motel 6 branded hotels.

74.     G6 regularly inspected Motel 6.

75.     One of G6's most valuable assets is its brand.

76.     G6 requires JRD Partnership to adhere to strict requirements, including but not limited to:

- standardized training methods for employees of Motel 6;

- building and maintaining the Motel 6 in a manner specified by G6;

- standardized or strict rules of operation for the Motel 6;

- regular inspection of the Motel 6 and its operation by Defendant G6;

- prices fixed by Defendant G6 for the Motel 6;

- Defendant G6 provided an online booking platform for the Motel 6;

19

- Defendant G6 established reporting requirements for the Motel 6; and

- other actions that deprived JRD Partnership of independence in the business operations of the Motel 6.

77.     G6 specifically retained control of the day-to-day operation of Defendant JRD Partnership with regard to aspects of operation of the subject Motel 6 that caused T.W.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

78.     G6 regularly advised Defendant JRD Partnership on operational changes necessary for it to remain in compliance with G6's strict regulations.

79.     G6 had the ability to impose fees or fines on JRD Partnership. Furthermore, at all material times, G6 retained an absolute right to cancel its franchise agreement with Defendant JRD Partnership if G6's rules were violated or if JRD Partnership otherwise failed to comply with its contractual obligations.

80.     At all relevant times, Defendant JRD Partnership acted as the agent of Defendant G6 when operating the subject Motel 6.

81.     G6 and Defendant JRD Partnership shared control of the terms and conditions of the employment of staff at the subject Motel 6 and, therefore, Defendant G6 and Defendant JRD Partnership are joint employers. Upon information and belief, Defendant G6 exercised control over the terms and conditions employment of staff at the subject Motel 6 by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

20

82.     Therefore, as a result of the strict reporting requirements, at all material times, each and every Defendant knew or should have known of their facilitation of sex trafficking at the subject hotels, including the facilitation of the sex trafficking of T.W.

83.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Motel 6, Motel 6 Franchisor Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

84.     Motel 6 Franchisor Defendants knew or should have known that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe T.W.'s sexual exploitation.

85.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Motel 6, Motel 6 Franchisor Defendants continued operating Motel 6 together with JRD Partnership in a way that it knew or should have known would result in facilitating additional sex trafficking at Motel 6, including by:

> a.  adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;
>
> b.  adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;
>
> c.  adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;
>
> d.  adopting and enforcing policies and protocol regarding trafficking in a way that let to widespread and ongoing trafficking at the hotel property;
>
> e.  providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at Motel 6;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

86. If Motel 6 Franchisor Defendants had exercised reasonable diligence when operating Motel 6 and, in the areas, where it retained control, Motel 6 Franchisor Defendants would have prevented the Motel 6 from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W. Instead, Motel 6 Franchisor Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W.

**E. Defendants' ventures at Motel 6.**

87. Through the conduct described above, Motel 6 Franchisor Defendants and JRD Partnership knowingly benefited from engaging in a venture with sex traffickers at Motel 6, including Jane Doe T.W.'s traffickers, as follows:

a. Motel 6 Franchisor Defendants and JRD Partnership both received benefits, including increased revenue, every time a room was rented at Motel 6.

b. This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at Motel 6, which Motel 6 Franchisor Defendants and JRD Partnership knew or should have known about.

c. Motel 6 Franchisor Defendants and JRD Partnership associated with traffickers, including Jane Doe T.W.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Motel 6 Franchisor Defendants and JRD Partnership had a mutually beneficial relationship with the traffickers at Motel 6, fueled by sexual exploitation of victims.

22

e. Sex traffickers, including Jane Doe's traffickers, frequently used Motel 6 for their trafficking because of an implicit understanding that Motel 6 was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Motel 6 Franchisor Defendants and JRD Partnership facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Motel 6 Franchisor Defendants and JRD Partnership.

f. Both Motel 6 Franchisor Defendants and JRD Partnership participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. Jane Doe T.W.'s trafficking at Motel 6 was a result of Motel 6 Franchisor Defendants and JRD Partnership's participation in a venture with criminal traffickers. If Motel 6 Franchisor Defendants and JRD Partnership had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.W.'s trafficking at Motel 6.

88. Through the conduct described above, Motel 6 Franchisor Defendants also knowingly benefited from engaging in a venture with JRD Partnership operating Motel 6 as follows:

a. Motel 6 Franchisor Defendants and JRD Partnership to operate Motel 6.

b. Pursuant to the terms of the franchising agreement, both Motel 6 Franchisor Defendants and JRD Partnership received financial benefits from operating Motel 6, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §1591(a) through the conduct of JRD Partnership and the widespread sex trafficking at Motel 6.

d. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Motel 6 Franchisor Defendants participated in the venture by continuing to associate with JRD Partnership to operate Motel 6 in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe T.W.

e. Jane Doe T.W.'s trafficking at Motel 6 was a result of Motel 6 Franchisor Defendants' and JRD Partnership's facilitation of the widespread and

23

ongoing violations of 18 U.S.C. §1591(a) at Motel 6. Had Motel 6 Franchisor Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe T.W.'s trafficking at Motel 6.

**F. JRD Partnership and the staff at Motel 6 acted as actual agents of Motel 6 Franchisor Defendants.**

89. Motel 6 Franchisor Defendants is vicariously liable for the acts, omissions, and knowledge of Motel 6 Franchisor Defendants and staff at Motel 6, which are Motel 6 Franchisor Defendants' actual agents or subagents.

90. Motel 6 Franchisor Defendants subjected JRD Partnership to detailed standards and requirements regarding the operation of Motel 6 through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Motel 6 Franchisor Defendants. These written standards, protocols, and requirements:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools JRD Partnership used at Motel 6; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c. dictated the specific manner in which JRD Partnership and hotel staff must carry out most day-to-day functions at Motel 6; and

d. significantly exceeded what was necessary for Motel 6 Franchisor Defendants to protect its registered trademarks.

91. In addition to the ways described above, upon information and belief, Motel 6 Franchisor Defendants exercised and reserved the right to exercise systemic and pervasive control over JRD Partnership's day-to-day operation of the Motel 6, including the following ways:

24

a. requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

b. requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

c. requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

d. exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

e. dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

f. requiring franchisees to use specific complaint resolution programs;

g. dictating the response of franchisees to specific complaints;

h. exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

i. requiring franchisees to participate in mandatory marketing and advertising programs;

j. exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

k. restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

l. exercising or retaining control over all aspects of building and facility design;

m. reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n. retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o. retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p. publicly labeling hotel employees as "our staff" or "our hotel staff";

q. exercising or retaining control over human resources issues at the hotel property;

r. posting jobs for its branded properties;

s. providing benefits to staff of its branded properties;

t. setting parameters and guidelines for mandatory evaluations of hotel staff;

u. setting pay, pay parameters, or pay ranges for hotel staff;

v. setting job qualifications for hotel staff;

w. setting job descriptions for hotel staff;

x. adopting policies that specifically dictate which positions must perform which day-to-day functions;

y. dictating staffing levels required at hotels;

z. making or influencing hiring decisions for hotel staff;

aa. providing or controlling onboarding for hotel staff;

bb. exercising or retaining control over standardized training for hotel employees and management;

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend franchisor led training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. establishing employee recognition programs for hotel staff;

jj. requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

kk. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

92.     Upon information and belief, Motel 6 Franchisor Defendants had the right to and did enforce its control over JRD Partnership through various methods, including:

a. the right to conduct detailed inspections of the Motel 6;

b. monitoring or auditing the JRD Partnership for compliance with policies and expectations;

c. directing JRD Partnership to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations;

## V.     Sex Trafficking at Days Inn

### A. Wyndham and Days Inn Franchisee Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at Days Inn.

93.     Wyndham and Days Inn Franchisee Defendants were specifically aware that sex trafficking was widespread and ongoing at the Days Inn.

94.     Articles regarding and online reviews of subject Days Inn, which upon information and belief were monitored by Wyndham and Days Inn Franchisee Defendants, establish the nature of Days Inn's role as a venue for sex trafficking:

27

a. Google review dated 6 years ago: *"this hotel is for drug people and ladies of the night."* – Penny Mullin[22]

b. Google review dated 10 months ago: *"Women walking around looking for some action."* – Laura Williams

c. Booking.com review dated September 29, 2021 – *"The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings."* - Peggy[23]

95.     Wyndham and Days Inn Franchisee Defendants also knew or should have known about the sex trafficking pervasive at the Days Inn based on obvious indicators of this activity. Traffickers, including Jane Doe T.W.'s traffickers, repeatedly chose to use the Days Inn for their sex trafficking activity. Apparent indicia of widespread and ongoing sex trafficking at Days Inn included:

a. There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays.

b. There was widespread drug trade at the hotel, which is closely linked to human trafficking.

c. There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution.

d. Rooms used by the traffickers were regularly observed to be mess, to contain excessive sex and drug paraphernalia, and to have an unclean smell.

---

[22]
https://www.google.com/travel/search?q=days%20inn%201100%20highway%2076%20clarksville%20tn&g2lb=2502548%2C2503771%2C2503781%2C4258168%2C4270442%2C4284970%2C4291517%2C4308227%2C4597339%2C4757164%2C4814050%2C4850738%2C4864715%2C4874190%2C4886480%2C4893075%2C4924070%2C4963887%2C4965990%2C4990494%2C72246918%2C72248281%2C72254357%2C72262103%2C72271797%2C72278630%2C72279098%2C72286089%2C72289744%2C72291819%2C72294114%2C72294115%2C72296743&hl=en-US&gl=us&ssta=1&ts=CAESABpGCigSJjIkMHg4ODY0ZGUyZjZkZTc4M2FKOjB4N2JmZDYwMTUxNTg4NmNmEhoSFAoHCOcPEAcYGRIHCOcPEAcYGhgBMgIQAA&qs=CAEyE0Nnb0l6NDNpaXBBYQTlkOEhFQUU4AkILCc-GWFEB1r8HGAFCCwnPhlhRAda_BxgB&ap=ugEHcmV2aWV3cw&ictx=1&sa=X&ved=0CAAQ5JsGahcKEwjglY3j8Oj_AhUAAAAAHQAAAAAQCw (last visited June 29, 2023)

[23] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

28

96.     All knowledge from the staff at Days Inn is imputed to Days Inn Franchisee Defendants. Days Inn Franchisee Defendants knew about this widespread and ongoing trafficking at Days Inn, including the trafficking of Jane Doe T.W., through the direct observations of hotel staff, including management-level staff.

97.     Upon information and belief, Franchisor knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available to Franchisor because Franchisor:

   a.  conducted regular inspections of the hotel property;

   b.  employed "field agents" to work with hotels on trafficking issues;

   c.  publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

   d.  required franchisee and hotel staff to report suspected trafficking activity to Franchisor;

   e.  was involved in day-to-day consulting on operational issues at hotel;

   f.  had access to surveillance systems;

   g.  collected and monitored data that showed patterns consistent with trafficking;

   h.  participated in internal investigations;

   i.  solicited and received customer feedback and complaints.

**B.  The activities of Jane Doe T.W.'s trafficker at Days Inn were apparent and obvious.**

98.     During the 30-month period that Jane Doe T.W. was trafficked at Days Inn, there were obvious signs that her traffickers were engaged in sex trafficking.

   a.  There was constant and heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had approximately 15 men per day sexually exploiting her at Days Inn.

29

b.  Men sexually exploiting Jane Doe entered and left her room at unusual times and stayed for brief periods.

c.  Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

d.  Jane Doe's traffickers would decline room service for several consecutive days.

99.  Days Inn Franchisee Defendants knew or was willfully blind to the fact that Jane Doe was being trafficked.

100.  Given these obvious signs, Wyndham knew or should have known about the trafficking of Jane Doe T.W. based on its policy or protocol that required hotel staff to report suspected trafficking.

101.  Wyndham and Days Inn Franchisee Defendants had constructive knowledge of the trafficking of Jane Doe T.W. at Days Inn because that trafficking was the direct result of Wyndham and Days Inn Franchisee Defendants facilitating trafficking at Days Inn.

## C. Days Inn Franchisee Defendants facilitated the trafficking activity at Days Inn, including the trafficking of Jane Doe T.W.

102.  Days Inn Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the Days Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Days Inn Franchisee Defendants ratified these acts and omissions, and because Days Inn Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Days Inn Franchisee Defendants, of human trafficking occurring in the Days Inn.

30

103.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, Days Inn Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

104.    Days Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe T.W.'s sexual exploitation.

105.    Days Inn Franchisee Defendants also facilitated widespread trafficking at Days Inn, including the trafficking of Jane Doe T.W., in ways including:

    a.  Accommodating specific requests of the traffickers for room location.

    b.  Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

    c.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**D.  Wyndham facilitated the trafficking activity at Days Inn, including the trafficking of Jane Doe T.W.**

106.    Wyndham directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

    a.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

    b.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

    c.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

d. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

e. Requiring the franchisee to use a data-management system operated and controlled by the franchisor;

f. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

g. exercising control over the price of rooms;

h. controlling all details of the customer loyalty program that the franchisee was required to implement;

i. setting detailed policies for the check-in process, including requirements for identification and payment methods;

j. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

k. assuming sole ownership over all guest information;

l. overseeing do not rent (DNR) lists for its branded properties.

107. Wyndham directly participated in and retained control over aspects of the operation of Days Inn related to trafficking by:

a. assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

32

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

108. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, Wyndham continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

109. Wyndham knew or should have known that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe T.W.'s sexual exploitation.

110. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, Wyndham continued operating Days Inn together with Days Inn Franchisee Defendants in a way that it knew or should have known would result in facilitating additional sex trafficking at Days Inn, including by:

33

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

111. If Wyndham had exercised reasonable diligence when operating Days Inn and in the areas where it retained control, Wyndham would have prevented the Days Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W. Instead, Wyndham engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W.

**E. Defendants' ventures at Days Inn.**

112. Through the conduct described above, Wyndham and Days Inn Franchisee Defendants knowingly benefited from engaging in a venture with sex traffickers at Days Inn, including Jane Doe T.W.'s traffickers, as follows:

34

a. Wyndham and Days Inn Franchisee Defendants both received benefits, including increased revenue, every time a room was rented at Days Inn.

b. This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at Days Inn, which Wyndham and Days Inn Franchisee Defendants knew or should have known about.

c. Wyndham and Days Inn Franchisee Defendants associated with traffickers, including Jane Doe T.W.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Wyndham and Days Inn Franchisee Defendants had a mutually beneficial relationship with the traffickers at Days Inn, fueled by sexual exploitation of victims.

e. Sex traffickers, including Jane Doe T.W.'s traffickers, frequently used Days Inn for their trafficking because of an implicit understanding that Days Inn was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Wyndham and Days Inn Franchisee Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Wyndham and Days Inn Franchisee Defendants.

f. Both Wyndham and Days Inn Franchisee Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. Jane Doe T.W.'s trafficking at Days Inn was a result of Wyndham and Days Inn Franchisee Defendants' participation in a venture with criminal traffickers. If Wyndham and Days Inn Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.W.'s trafficking at Days Inn.

113. Through the conduct described above, Wyndham also knowingly benefited from engaging in a venture with Days Inn Franchisee Defendants operating Days Inn as follows:

a. Wyndham and Days Inn Franchisee Defendants to operate Days Inn.

b. Pursuant to the terms of the franchising agreement, both Wyndham and Days Inn Franchisee Defendants received financial benefits from operating Days Inn, including revenue generated specifically by renting rooms to

35

traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §1591(a) through the conduct of Days Inn Franchisee Defendants and the widespread sex trafficking at Days Inn.

d. Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Wyndham participated in the venture by continuing to associate with Days Inn Franchisee Defendants to operate Days Inn in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe T.W.

e. Jane Doe T.W.'s trafficking at Days Inn was a result of Wyndham's and Days Inn Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at Days Inn. Had Wyndham not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe T.W.'s trafficking at Days Inn.

## F. Days Inn Franchisee Defendants and the staff at Days Inn acted as actual agents of Wyndham.

114. Wyndham is vicariously liable for the acts, omissions, and knowledge of Days Inn Franchisee Defendants and staff at Days Inn, which are Wyndham's actual agents or subagents.

115. Wyndham subjected Days Inn Franchisee Defendants to detailed standards and requirements regarding the operation of Days Inn through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by Wyndham. These written standards, protocols, and requirements:

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Days Inn Franchisee Defendants used at Days Inn; and

b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

36

c. dictated the specific manner in which Days Inn Franchisee Defendants and hotel staff must carry out most day-to-day functions at Days Inn; and

d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

116. In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Days Inn Franchisee Defendants' day-to-day operation of the Days Inn, including the following ways:

a. requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

b. requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

c. requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

d. exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

e. dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

f. requiring franchisees to use specific complaint resolution programs;

g. dictating the response of franchisees to specific complaints;

h. exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

i. requiring franchisees to participate in mandatory marketing and advertising programs;

j. exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

k. restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

l. exercising or retaining control over all aspects of building and facility design;

37

m. reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n. retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o. retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p. publicly labeling hotel employees as "our staff" or "our hotel staff";

q. exercising or retaining control over human resources issues at the hotel property;

r. posting jobs for its branded properties;

s. providing benefits to staff of its branded properties;

t. setting parameters and guidelines for mandatory evaluations of hotel staff;

u. setting pay, pay parameters, or pay ranges for hotel staff;

v. setting job qualifications for hotel staff;

w. setting job descriptions for hotel staff;

x. adopting policies that specifically dictate which positions must perform which day-to-day functions;

y. dictating staffing levels required at hotels;

z. making or influencing hiring decisions for hotel staff;

aa. providing or controlling onboarding for hotel staff;

bb. exercising or retaining control over standardized training for hotel employees and management;

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend franchisor led training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

38

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. establishing employee recognition programs for hotel staff;

jj. requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

kk. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

117. Upon information and belief, Wyndham had the right to and did enforce its control over Days Inn Franchisee Defendants through various methods, including:

a. the right to conduct detailed inspections of the subject Days Inn;

b. monitoring or auditing the Days Inn Franchisee Defendants for compliance with policies and expectations;

c. directing Days Inn Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations;

39

**VI.     Defendants are Jointly and Severally Liable for Jane Doe's Damages**

118.    The venture or ventures in which each Defendant participated were proximate causes of the injuries and damages to Jane Doe T.W. and were direct causes and/or substantial factors in causing those injuries and damages.

119.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe T.W. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

**I.     Cause of Action 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)**

120.    Jane Doe T.W. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

121.    Each of the Franchisee Defendants is a perpetrator within the meaning of 18 U.S.C §1595(a) because each of the Franchisee Defendants:

   a.   violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe T.W.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

   b.   violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

## II. Cause of Action 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)

122.    Jane Doe T.W. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

123.    Through acts and omissions described throughout this Complaint, each of the Franchisor Defendants and each of the Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe T.W.'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe T.W.'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each of the Franchisor Defendants and each of the Franchisee Defendants is liable as a beneficiary under 18 U.S.C §1595(a).

124.    Through the acts and omissions described throughout this Complaint, each of the Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisee regarding the operation of its respective hotel property despite the fact that each Franchisor Defendant knew or should have known that this venture was violating 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2).

125.    Violations of 18 U.S.C §1595(a) by each of the Franchisor Defendants and each of the Franchisee Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe T.W. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

41

## III.    Cause of Action 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

126.    Each of the Franchisee Defendants acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

127.    Each of the Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

128.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

129.    Each of the Franchisor Defendants is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

130.    As alleged above, JRD Partnership is directly liable to Jane Doe T.W. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Motel 6 Franchisor Defendants are also directly liable to Jane Doe T.W. under § 2255. Motel 6 Franchisor Defendants are vicariously liable to Jane Doe T.W. for those same violations.

131.    As alleged above, Days Inn Franchisee Defendants are directly liable to Jane Doe T.W. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Wyndham is also directly liable to Jane Doe T.W. under § 2255. Wyndham is vicariously liable to Jane Doe T.W. for those same violations.

# IV. Cause of Action 4: Franchisor's Vicarious Liability for Franchisee's Violations of the TVPRA as Joint Employer of the Staff at the subject Motel 6 and Days Inn

132.    At all relevant times, Motel 6 Franchisor Defendants and JRD Partnership were joint employers of the staff of the subject Motel 6 because they exercised joint control over the terms and conditions of employment, and economic realities reflect joint employment.

133.    Under the TVPRA and the federal common law, Motel 6 Franchisor Defendants, as a joint employer of the staff of the subject Motel 6, is vicariously liable for the acts and omissions of the staff of the subject Motel 6.

134.    As alleged above, the staff of the subject Days Inn engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). Wyndham are vicariously liable for these TVPRA violations.

135.    At all relevant times, Wyndham and Days Inn Franchisee Defendants were joint employers of the staff of the subject Days Inn because they exercised joint control over the terms and conditions of employment, and economic realities reflect joint employment.

136.    Under the TVPRA and the federal common law, Wyndham, as a joint employer of the staff of the subject Motel 6, is vicariously liable for the acts and omissions of the staff of the subject Days Inn.

137.    As alleged above, the staff of the subject Days Inn engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). Wyndham is vicariously liable for these TVPRA violations.

## DAMAGES

138.    Jane Doe T.W. seeks the following damages, joint and severally, from all Defendants:

      a.  Actual damages;

      b.  Direct damages;

c.  Incidental and consequential damages;

d.  Mental anguish and emotional distress damages (until trial and in the future)

e.  Lost earnings and lost earning capacity;

f.  Loss of self-esteem and self-worth;

g.  Necessary medical expenses;

h.  Physical pain and suffering;

i.  Physical impairment;

j.  Emotional impairment;

k.  Unjust enrichment;

l.  Exemplary/Punitive damages;

m.  Attorneys' fees;

n.  Costs of this action; and

o.  Pre- and post-judgment interest at the maximum legal rates.

139.   Jane Doe T.W. is entitled to treble damages.

140.   A constructive trust should be imposed on all Defendants and the Court should sequester any benefits or money wrongfully received by all Defendants for the benefit of Jane Doe T.W.

## DISCOVERY RULE

To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injuries arose from being trafficked at Defendants' hotels or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injuries, and

44

certainly not more than ten years before suit was filed. Moreover, Plaintiff was not in a position to discover the existence of a cause of action for human trafficking until shortly before suit was filed, and certainly not more than ten years before suit was filed.

### JURY DEMAND

141.    Jane Doe (T.W.) requests a trial by jury.

### REQUEST FOR RELIEF

WHEREFORE, Jane Doe (T.W.) requests that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (T.W.) against all Defendants jointly and severally for such actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (T.W.) may be justly entitled.

Respectfully submitted,

/s/ Michael Hamilton
Michael Hamilton (BPR # 010720)
**PROVOST★UMPHREY LAW FIRM LLP**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
615.297.1932 – phone
615.297.1986 – fax
mhamilton@pulf.com

Guy G. Fisher
**PROVOST★UMPHREY LAW FIRM LLP**
350 Pine Street, Ste. 1100
Beaumont, Texas 77701
409.835.6000 – phone
409.813.8625 – fax
gfisher@pulf.com

**ANNIE MCADAMS, PC**
ANNIE MCADAMS
1150 Bissonnet
Houston, TX 77005
713.785.6262 - phone
866.713.6141 - fax
annie@mcadamspc.com

*Attorneys for Plaintiff*

46