# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JANE DOE (T.W.), AN INDIVIDUAL,

Plaintiff,

v.

JRD PARTNERSHIP D/B/A AMERICA'S
BEST INN; AMERICA'S BEST INN, INC.;
AMERICA'S BEST FRANCHISING, INC.;
VHGI, INC., f/k/a VANTAGE
HOSPITALITY GROUP, INC.; DAYS
INNS WORLDWIDE, INC.; WYNDHAM
HOTEL GROUP, LLC; WYNDHAM
HOTELS & RESORTS, INC.,; SHRI
MAHAVIRA CLARKSVILLE, INC. D/B/A
DAYS INN; SHREE MAHAVIRA, LLC
D/B/A DAYS INN;

Defendants.

CIVIL ACTION NO: 3:23-cv-00928
Judge Eli J. Richardson
Magistrate Judge Jeffrey S. Frensley

## SECOND AMENDED COMPLAINT

Plaintiff Jane Doe (T.W.) files this Second Amended Complaint and respectfully shows the Court as follows:

### SUMMARY

1.      Jane Doe (T.W.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at an America's Best Inn and a Days Inn; owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

1

coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (T.W.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (T.W.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

2

## PARTIES

7.      Plaintiff Jane Doe (T.W.) is a resident of Casselberry, Florida.

8.      Jane Doe (T.W.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

9.      The trafficking of Jane Doe (T.W.) occurred in or affected interstate commerce.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (T.W.).

11.     America's Best Inn, Inc., ("AB Inn") is a Delaware corporation with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: the Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, Delaware, 19808. Upon information and belief, at all relevant times, AB Inn owned, operated, controlled, and/or managed the America's Best Inn at 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040 (hereinafter "the Clarksville America's Best Inn").

12.     America's Best Franchising, Inc., ("AB Franchising") is a Georgia corporation with its principal place of business in Atlanta, Georgia. It may be served through its registered agent: Sterling Stoudenmire, 50 Glenlake Parkway, Suite 350, Atlanta, GA, 30328. Upon information and belief, at all relevant times, AB Franchising owned, operated, controlled, and/or managed the Clarksville America's Best Inn.

13.     VHGI, Inc., formerly known as Vantage Hospitality Group, Inc., ("Vantage") is a Florida corporation with its principal place of business in Coral Springs, Florida. It may be served through its registered agent: Bernard T. Moyle, 10800 W Sample Road, Coral Springs Florida, 33065. Upon information and belief, in 2014, Vantage, directly and through its wholly owned and

3

controlled subsidiaries, began managing America's Best hotels and subsequently acquired the America's Best brand from AB Franchising, which it continued operating at locations throughout the United States, including in Tennessee. Upon information and belief, Vantage is a successor to the liability of AB Franchising for acts and omissions related to the Clarksville America's Best Inn. All references to "Vantage" include references to the acts and omission of its predecessors for which it is liable. Upon information and belief, at relevant times Vantage—directly and/or through its predecessors—owned, operated, controlled, and/or managed the Clarksville America's Best Inn.

14. AB Inn, AB Franchising, and Vantage are referred to collectively as "AB Brand Defendants."

15. JRD Partnership is a for-profit corporation with its principal place of business in Clarksville, Tennessee. JRD Partnership may be served at: 3080 Wilma Rudolph Blvd., Clarksville, Tennessee 37040. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed the Clarksville America's Best Inn through the America's Best franchising system. JRD Partnership may be referred to as "JRD Partnership" or as "AB Franchisee Defendant."

16. Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Clarksville Days Inn. All references to WHR include the acts and omissions of predecessor entities

4

for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

17.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

18.     Days Inns Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

19.     WHR, WHG, and DIW are referred to collectively as the "Wyndham Brand Defendants."

20.     The AB Brand Defendants and the Wyndham Brand Defendants are referred to collectively as "Franchisor Defendants."

21.     Upon information and belief, at all relevant times, the Wyndham Brand Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Days Inn located at 1100 Hwy 76, I-24, Clarksville, Tennessee 37043 (hereinafter "the Clarksville Days Inn") through the Wyndham franchising system.

22.     Shri Mahavira, LLC d/b/a Days Inn is a for-profit Tennessee corporation with its principal place of business in Clarksville, Tennessee. Shri Mahavira Clarksville, Inc. d/b/a Days Inn may be served at 1100 Hwy 76, Clarksville, Tennessee 37043. Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed the Clarksville Days Inn through the Wyndham franchising system. Shri Mahavira Clarksville, Inc. d/b/a Days Inn may be referred to as "Shri Mahavira" or as "Days Inn Franchisee Defendant."

5

23.     Shree Mahavira, LLC d/b/a Days Inn is a for-profit Tennessee corporation with its principal place of business in Clarksville, Tennessee. Shree Mahavira, LLC d/b/a Days Inn may be served at 1100 Hwy 76, Clarksville, Tennessee 37043. Upon information and belief, at relevant times, it owned, operated, controlled, and/or managed the Clarksville Days Inn through the Wyndham franchising system. Shree Mahavira, LLC d/b/a Days Inn may be referred to as "Shree Mahavira" or as "Days Inn Franchisee Defendant,"

24.     Shri Mahavira Clarksville, LLC.; and Shree Mahavira, LLC are referred to collectively as the "Days Inn Franchisee Defendants."

25. AB Franchisee Defendant and the Days Inn Franchisee Defendants are referred to collectively as "Franchisee Defendants."

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.     Jane Doe (T.W.) was a victim of unlawful sex trafficking at America's Best and Days Inn hotels owned, operated, managed, and controlled by Defendants.**

28.     From approximately April 2011 through October 2014, Jane Doe T.W. was repeatedly trafficked, often for days at a time, at the Clarksville America's Best Inn and the Clarksville Days Inn.

29.     T.W. met her trafficker, Bobby Ward, through Facebook, who offered her a housekeeping job.

6

30.     T.W.'s trafficker used force and threats to force and coerce her into sex trafficking, including by pulling her hair and threatening her family.

**A.  Jane Doe T.W.'s Trafficking at Clarksville America's Best Inn**

31.     Between April 2011 and October 2014, Jane Doe (T.W.) was trafficked at the Clarksville America's Best Inn.

32.     Jane Doe T.W.'s sexual exploitation repeatedly occurred in rooms of the Clarksville America's Best Inn and was facilitated by the AB Brand Defendants and JRD Partnership.

33.     Jane Doe T.W.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Clarksville America's Best Inn including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided the AB Brand Defendants and JRD Partnership with notice that Jane Doe T.W.'s was being continually subjected to coercion, control, and exploitation.

**B.  Jane Doe T.W.'s Trafficking at Days Inn**

34.     Between April 2011 and October 2014, Jane Doe (T.W.) was trafficked at Days Inn. Her trafficker used force, fraud, and coercion to cause her to engage in commercial sex for the financial benefit of her trafficker.

35.     Jane Doe T. W.'s sexual exploitation repeatedly occurred in rooms of the Clarksville Days Inn and was facilitated by the Wyndham Brand Defendants and Days Inn Franchisee Defendants.

36.     Jane Doe T.W.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and

7

apparent to the staff and management of the Clarksville Days Inn including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided the Wyndham Brand Defendants and the Days Inn Franchisee Defendants with notice that Jane Doe T.W.'s was being continually subjected to coercion, control, and exploitation.

## II.  The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem

37.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what each Defendant knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe T.W.

38.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of the commercial exploitation of children.[5]

39.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking. Multiple agencies and

---

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id
[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.
[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf
[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

8

organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

40.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, of which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:

- Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals showing signs of physical abuse, restraint, and/or confinement;

- Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lacking freedom of movement or are constantly monitored;

- Individuals avoiding eye contact and interaction with others;

- Individuals having no control over or possession of money or ID;

- Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals having few or no personal items—such as no luggage or other bags;

- Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

- A group of girls appearing to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.[7]

41.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

42.    Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

43.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.  It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

44.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[8]

_____

[7] *Id.*
[8] *Id.*

45.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

46.     The most effective weapon against sexual exploitation and human trafficking is education and training.[9] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[10]

47.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[11] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

48.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue

---

[9] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[10] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[11] AHLA, *Free Online Training*, https://www.ahla.com/issues/online-human-trafficking (last visited April 13, 2023).

from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

49.     Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example, the Wyndham brand has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[12] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[13] However, the Wyndham Brand Defendants have refused to publish reports to show the brand's progress on the EPCAT goals to combat sex trafficking in hotels.[14]

50.     Each of the Defendants had a responsibility to adopt, implement, and enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

51.     Unfortunately for Jane Doe T.W., the promises made by the Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe T.W.

---

[12] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[13] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[14] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

**III.     Sex Trafficking Has Long Been Prevalent at the Franchisor Defendants' Branded Properties, and They Have Known About It.**

52.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe T.W.'s trafficking, that sex trafficking was ongoing and widespread at its branded properties.

53.     Upon information and belief, each of the Franchisor Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe T.W. was trafficked. Upon information and belief, each of the Franchisee Defendants monitored criminal activity occurring at the hotels they operated and other areas hotels and were aware of activity indicating commercial sex trafficking or related crimes.

**A.   The use of America's Best Inn properties for sex trafficking is prevalent.**

54.     The use of America's Best Inn properties for sex trafficking is well known to the AB Brand Defendants. Information that has become public through news stories and online reviews establishes the entrenched and pervasive nature of AB Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years.

55.     Examples of news stories that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at the AB Brand Defendants' properties, include:

- In 2011, a news article regarding a drug arrest at a Georgia America's Best Inn noted that the hotel was a location "known for drugs and prostitution."[15]

- In 2014, a man was convicted of prostituting teenage girls at an America's Best Inn in Michigan.[16]

---

[15] https://patch.com/georgia/norcross/crack-arrest-at-americas-best-hotel-a-location-known-aa2ba23316
[16] https://www.fox17online.com/2014/05/01/gr-man-convicted-of-recruiting-teens-for-prostitution-in-muskegon

- In 2014, an America's Best Inn in Indiana was forced to close because it was deemed a public nuisance based on widespread drug dealing and prostitution occurring on site.[17]

- In 2016, the manager of an America's Best Inn in Virginia was arrested for asking three separate women, including a 16-year-old girl, to have sex with him in return for a free room.[18]

- In 2020, a Georgia District Attorney filed a suit to have an America's Best Inn declared a public nuisance based on the hotel looking the other way from criminal activity, including prostitution and drug trafficking.[19]

- In 2021, a Florida city filed a lawsuit seeking to have an America's Best Inn declared a public nuisance because the hotel was allowing criminal activity to occur on the property and failing to report crimes, including drugs use, prostitution, assault, robbery, and theft.[20]

56. Examples of the many online reviews that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at the AB Brand Defendants' properties, including the Clarksville America's Best Inn, include:

- A 2014 review for an America's Best Inn in Alabama states "There was a couple youg fellas sligin dope in the stairwell and a very friendly girl on the stroll on the ground floor of the hotel. STAY AWAY FROM HERE!!"[21]

- A 2014 review for an America's Best Inn in Indiana states "This motel is filthy dirty, horrible cliental and very unsafe. After arriving at this location we refused to stay...it would have been taking your life in your own hands…. I would never recommend anyone to ever stay at this location and feel sorry for those who do stay there as their home. Basically it reminded me of a one night stand drug dealing motel. The City should look into closing this place down forever."[22]

- A 2015 review for an America's Best Inn in Florida stated, "My mom and aunt came here to visit us from Michigan for Mother's Day and come to find out that

---

[17] https://www.indystar.com/story/news/crime/2014/05/15/police-order-two-hotels-shut-amid-drug-prostitution-allegations/9134145/

[18] https://wydaily.com/news/local/2017/07/24/motel-manager-charged-with-soliciting-sex-from-teen-to-face-grand-jury-nws/

[19] https://wgxa.tv/news/local/public-nuisance-over-100-emergency-calls-made-at-three-macon-motels

[20] https://www.jacksonville.com/story/news/courts/2021/07/01/jacksonville-lawsuit-baymeadows-motel-deserves-public-nuisance-label/7794690002/

[21] https://www.tripadvisor.com/Hotel_Review-g30375-d72317-Reviews-or10-America_s_Best_Inn_Birmingham_Airport-Birmingham_Alabama.html#REVIEWS

[22] https://www.tripadvisor.com/Hotel_Review-g37012-d91331-Reviews-or20-America_s_Best_Inns_and_Suites_Clarksville-Clarksville_Indiana.html#REVIEWS

14

there nothing but hustlers and hookers standing outside on the premises and peering through windows and doors."[23]

- A 2017 review for an America's Best Inn in Florida stated "At night the pimps, drug dealers and prostitutes move about the parking lot openly."[24]

- A 2017 review for an America's Best Inn in Georgia states: "Seemed to be drug dealers and hookers all over the place."[25]

57. These reviews are representative examples. There are many similar online reviews for the AB Brand Defendants' branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2014 that are not currently available on the internet.

58. Upon information and belief, each of the AB Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking.

59. Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, the AB Brand Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

**B. The use of Wyndham properties for sex trafficking is prevalent.**

60. Upon information and belief, at all relevant times the Wyndham Brand Defendants have adopted a centralized approach to trafficking-related issues at all Wyndham branded properties, including Days Inn properties. The Wyndham Brand Defendants' public statements confirm that they retained control over the response of its branded hotels to sex trafficking.

61. Unfortunately, while the Wyndham Brand Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather

---

[23] https://www.yelp.com/biz/americas-best-inn-and-suites-fort-lauderdale
[24] https://www.tripadvisor.com.sg/ShowUserReviews-g34227-d240087-r496766509-America_s_Best_Inn_Fort_Lauderdale-Fort_Lauderdale_Broward_County_Florida.html
[25] https://www.tripadvisor.com/Hotel_Review-g60814-d86768-Reviews-America_s_Best_Inn-Savannah_Georgia.html

than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[26]

62.     The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex.[27] Although the Wyndham Defendants publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[28]

63.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[29]

64.     The use of Days Inn for sex trafficking is well known to the Wyndham Brand Defendants. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. For example:

- In 2010, a man was arrested on human trafficking charges, accused of forcing teens into prostitution at a Days Inn."[30]

---

[26] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[27] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels
[28] https://endsexualexploitation.org/wyndham/
[29] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[30] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010),
Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

- June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[31]

- In 2012, federal officials caught and arrested a man alleged to have trafficked a 14-year-old girl at a Florida Days Inn.[32]

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[33]

- In October 2012, a woman was arrested for prostitution an Ohio Days Inn. This arrest came after a 2011 prostitution sting operation that netted six arrests.[34]

- A Days Inn owner in Pennsylvania was forced to pay 24 million dollars to teenage victims of sex trafficking who were exploited at the hotel in 2012 and 2013.[35]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[36]

- In 2015, a man was charged with trafficking teenage girls after being arrested at a Days Inn in Maryland.[37]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a

---

[31] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[32] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012) https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[33] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[34] https://patch.com/ohio/lakewood-oh/woman-arrested-for-prostitution-at-days-inn

[35] https://northeasttimes.com/2019/04/02/roosevelt-inn-days-inn-named-in-sex-trafficking-lawsuits/

[36] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[37] https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/

daily fee."[38] In 2017, arrests were made after it was discovered women were being trafficked out of another Days in Inn Tennessee.[39]

65.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at Wyndham branded hotels that was not reported in the media.

66.     Reviews of Wyndham's branded properties, which upon information and belief the Wyndham Brand Defendants monitor regularly, also show the pervasiveness of sex trafficking at its branded properties and their knowledge of the same. For example:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[40]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass" surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be

---

[38] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[39] https://www.wgnsradio.com/article/35818/human-trafficking-case-in-murfreesboro

[40] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definitely not a place for a family!"[41]

- August 2008 Trip advisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[42]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisy pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[43]

- December 2008 Trip advisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[44]

[41] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html
[42] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[43] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews
[44] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[45]

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[46]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[47] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[48]

---

[45] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

[46] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

[47] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html

[48] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[49]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[50]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[51]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[52]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[53]

- January 2013 review from Days Inn in Copiague, NY states "I would not wish this place on my worst enemy. The room smelled like a dead body and they tried to cover it up with Lysol. I let them know that I tried to air the room out for 20 minutes and it did not help. They moved me to the room next door and it was the same thing.

[49] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews
[50] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html
[51] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton
[52] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city
[53] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota

There were all kinds of ghetto trash hanging around my car when I was leaving and the place seemed like a party/hooker hotel based on the people hanging around there."[54]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[55] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[56]

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[57] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[58]

Footnotes
[54] https://www.tripadvisor.ca/Hotel_Review-g47533-d1176402-Reviews-Days_Inn_by_Wyndham_Long_Island_Copiague-Copiague_Long_Island_New_York.html
[55] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html
[56]
[57] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html
[58] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[59] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[60]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with a hotel, ever. I'm upset that I paid for such crappy service and room."[61] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[62]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[63]

---

[59] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html
[60] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews
[61] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html
[62] https://www.yelp.com/biz/days-inn-by-wyndham-beaumont-beaumont
[63] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews

23

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[64]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[65]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[66]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[67]

- September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."68 The hotel manager responded to this review on October 20, 2014.

67. These reviews are representative examples. There are many similar online reviews for Wyndham branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2014 that are not currently available on the internet.

68. Upon information and belief, the Wyndham Brand Defendants monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking.

---

[64] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews
[65] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html
[66] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia
[67] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html
[68] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

24

69. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, the Wyndham Brand Defendants continued to earn revenue through conduct that they knew or should have known would continue to facilitate that trafficking.

**C. The Franchisor Defendants' knowledge of widespread and ongoing sex trafficking at their branded hotels.**

70. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe T.W. was trafficked at their hotel properties, the Franchisor Defendants knew, at least, that:

   a. There was widespread and ongoing sex trafficking occurring at their branded properties.

   b. Sex trafficking was a brand-wide problem stemming from their top-level decisions.

   c. Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt  known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

   d. Their efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

   e. They were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

71. Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, the Franchisor Defendants earned revenue by continuing conduct that they knew or should have known would continue to facilitate that trafficking.

**IV.    Sex Trafficking at the Clarksville America's Best Inn**

**A. AB Brand Defendants and JRD Partnership had actual and constructive knowledge of widespread and ongoing sex trafficking at the Clarksville America's Best Inn.**

72. Sex trafficking was widespread and pervasive at the Clarksville America's Best Inn specifically.

73. The AB Brand Defendants and JRD Partnership knew or should have known about the sex trafficking pervasive at the Clarksville America's Best Inn based on obvious indicators of this activity.

74. Traffickers, including Jane Doe T.W.'s traffickers, repeatedly chose to use the Clarksville America's Best Inn for their sex trafficking activity. They selected this hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. Apparent indicia of widespread and ongoing sex trafficking at Clarksville America's Best Inn, consistent with the well-known "red flags" for sex trafficking in the hospitality industry, included:

    **a.** There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays.

    **b.** There was widespread drug trade at the hotel, which is closely linked to human trafficking.

    **c.** There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution.

    **d.** Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell.

75. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Clarksville America's Best Inn prior to Jane Doe T.W.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and

restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

76.     All knowledge from the staff at Clarksville America's Best Inn is imputed to JRD Partnership. JRD Partnership knew about this widespread and ongoing trafficking at Clarksville America's Best Inn, including the trafficking of Jane Doe T.W., through the direct observations of hotel staff, including management-level staff.

77.     Upon information and belief, the owners of the Clarksville America's Best Inn lived on site and directly observed the criminal activity on the property.[69]

78.     Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, JRD Partnership knew or should have known about the widespread trafficking at the Clarksville America's Best Inn based on non-public sources of information including but not limited to:

      a.  surveillance of the property;

      b.  internal investigations;

      c.  customer complaints;

      d.  monitoring of customer feedback;

      e.  information received from law enforcement; and

      f.  other sources of non-public information available to JRD Partnership.

79.     Upon information and belief, in addition to public sources of information about trafficking, the AB Brand Defendants knew or should have known about the widespread trafficking

---

[69] https://www.yellowpages.com/clarksville-tn/mip/americas-best-inn-10017352

27

at their branded properties, including the Clarksville America's Best Inn, based on non-public sources of information including but not limited to:

    a.   obligation of hotel staff and hotel management to report suspected trafficking activity to the AB Brand Defendants;

    b.   The AB Brand Defendants' practice of monitoring patterns in reports of criminal activity (including trafficking) and assessing areas and properties at elevated risk;

    c.   The AB Brand Defendants' regular monitoring of online reviews;

    d.   The AB Brand Defendants' collection and monitoring of customer surveys and complaints;

    e.   The AB Brand Defendants' regular inspections of the hotel property;

    f.   information provided to the AB Brand Defendants by law enforcement; and

    g.   other sources of non-public information available to the AB Brand Defendants'.

80.    Upon information and belief, the AB Brand Defendants adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to the AB Brand Defendants. Based on the existence of this protocol and the widespread and obvious trafficking at the Clarksville America's Best Inn, there were multiple instances of suspected sex trafficking that were or should have been reported to the AB Brand Defendants.

81.    The AB Brand Defendants and JRD Partnership had constructive knowledge of the widespread and ongoing trafficking at the Clarksville America's Best Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

**B. The activities of Jane Doe T.W.'s trafficker at Clarksville America's Best Inn were apparent and obvious.**

82.    During the 30-month period that Jane Doe T.W. was trafficked at the Clarksville America's Best Inn, there were obvious signs that her traffickers were engaged in sex trafficking.

28

a. There was constant and heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had approximately 15 men per day sexually exploiting her at the Clarksville America's Best Inn .

b. Men sexually exploiting Jane Doe entered and left her room at unusual times and stayed for brief periods.

c. Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.

d. Jane Doe's traffickers would decline housekeeping service for several consecutive days.

e. There were other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

83. JRD Partnership knew or was willfully blind to the fact that Jane Doe was being trafficked.

84. Given these obvious signs, the AB Brand Defendants knew or should have known about the trafficking of Jane Doe T.W. based on their policy or protocol that required hotel staff to report suspected trafficking.

85. At all material times, the AB Brand Defendants had robust reporting requirements in place for its franchisees, such as JRD Partnership.

86. The AB Brand Defendants required franchisees, such as JRD Partnership, to report all suspected instances of crime at Clarksville America's Best Inn branded properties.

87. Based on information observed by the staff at the subject Clarksville America's Best Inn, reports were or should have been made to the AB Brand Defendants about the sex trafficking of T.W.

88. Therefore, as a result of the strict reporting requirements, at all material times, each and every Defendant knew or should have known of their facilitation of sex trafficking at the Clarksville America's Best Inn, including the facilitation of the sex trafficking of T.W.

29

89.     The AB Brand Defendants and JRD Partnership had constructive knowledge of the trafficking of Jane Doe T.W. at Clarksville America's Best Inn because that trafficking was the direct result of the AB Brand Defendants and JRD Partnership facilitating trafficking at the Clarksville America's Best Inn.

**C.  JRD Partnership facilitated the trafficking activity at the Clarksville America's Best Inn, including the trafficking of Jane Doe T.W.**

90.     JRD Partnership is responsible for the acts, omissions, and knowledge of all employees of the Clarksville America's Best Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because JRD Partnership ratified these acts and omissions, and because JRD Partnership failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to JRD Partnership, of human trafficking occurring in the Clarksville America's Best Inn .

91.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Clarksville America's Best Inn, JRD Partnership continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

92.     JRD Partnership knew or was willfully blind to the fact that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe T.W.'s sexual exploitation.

93.     JRD Partnership also facilitated widespread trafficking at Clarksville America's Best Inn, including the trafficking of Jane Doe T.W., in ways including:

   a.  Accommodating specific requests of the traffickers for room location.

   b.  Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to guest safety, criminal activity, and trafficking.

30

c. Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**D. The AB Brand Defendants facilitated the trafficking activity at Clarksville America's Best Inn, including the trafficking of Jane Doe T.W.**

94. The AB Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Clarksville America's Best Inn, including by:

a. The AB Brand Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b. The AB Brand Defendants directly made reservations for rooms at the Clarksville America's Best Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The AB Brand Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement.

c. The AB Brand Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

d. The AB Brand Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation.

e. The AB Brand Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

f. The AB Brand Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Clarksville America's Best Inn.

g. The AB Brand Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Clarksville America's Best Inn until they entered their guest room.

31

This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

h. The AB Brand Defendants required franchisee to use a property management system, which was owned, maintained, controlled, and operated by the AB Brand Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

95. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Clarksville America's Best Inn, the AB Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

96. The AB Brand Defendants directly participated in and retained control over aspects of the operation of Clarksville America's Best Inn related to trafficking.

97. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Clarksville America's Best Inn, The AB Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

98. The AB Brand Defendants knew or should have known that Jane Doe T.W. and other victims were being trafficked and, despite this, benefited from continued association with criminal traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate sexual exploitation of victims, including Jane Doe T.W.

99. Upon information and belief, the AB Brand Defendants participated directly in aspects of the operation of the Clarksville America's Best that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to:

a. The AB Brand Defendants publicly assumed responsibility and control over the human trafficking response of all America's Best Inns properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

32

b. The AB Brand Defendants retained control over when branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in branded hotels.

c. The AB Brand Defendants retained control, at the brand-wide level, over security training, including how to detect and respond to criminal activity, including trafficking.

d. The AB Brand Defendants were responsible for adopting, enforcing, and monitoring policies and codes of conduct related to criminal activity, including human trafficking, at the Clarksville America's Best Inn.

e. The AB Brand Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Clarksville America's Best Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

100. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Clarksville America's Best Inn, the AB Brand Defendants continued operating Clarksville America's Best Inn together with JRD Partnership in a way that it knew or should have known would result in facilitating additional sex trafficking at Clarksville America's Best Inn, including by:

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing policies and protocol regarding trafficking in a way that let to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained internet systems despite having or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at Clarksville America's Best Inn;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

101. If the AB Brand Defendants had exercised reasonable diligence when operating Clarksville America's Best Inn and, the AB Brand Defendants would have prevented the Clarksville America's Best Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W. Instead, the AB Brand Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W.

**E. Defendants' ventures at Clarksville America's Best Inn.**

102. Through the conduct described above, the AB Brand Defendants and JRD Partnership knowingly benefited from engaging in a venture with sex traffickers at Clarksville America's Best Inn, including Jane Doe T.W.'s traffickers, as follows:

a. The AB Brand Defendants and JRD Partnership both received benefits, including increased revenue, every time a room was rented at Clarksville America's Best Inn.

b. This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at Clarksville America's Best Inn, which the AB Brand Defendants and JRD Partnership knew or should have known about.

c. The AB Brand Defendants and JRD Partnership associated with traffickers, including Jane Doe T.W.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

34

**d.** The AB Brand Defendants and JRD Partnership had a mutually beneficial relationship with the traffickers at Clarksville America's Best Inn, fueled by sexual exploitation of victims.

**e.** Sex traffickers, including Jane Doe's traffickers, frequently used Clarksville America's Best Inn for their trafficking because of an implicit understanding that Clarksville America's Best Inn was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of the AB Brand Defendants and JRD Partnership facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for the AB Brand Defendants and JRD Partnership.

**f.** Both the AB Brand Defendants and JRD Partnership participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

**g.** Jane Doe T.W.'s trafficking at Clarksville America's Best Inn was a result of the AB Brand Defendants and JRD Partnership's participation in a venture with criminal traffickers. If the AB Brand Defendants and JRD Partnership had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.W.'s trafficking at Clarksville America's Best Inn.

103.    Through the conduct described above, the AB Brand Defendants also knowingly benefited from engaging in a venture with JRD Partnership operating Clarksville America's Best Inn as follows:

**a.** The AB Brand Defendants and JRD Partnership acted together to operate Clarksville America's Best Inn.

**b.** Pursuant to the terms of the franchising agreement, both The AB Brand Defendants and JRD Partnership received financial benefits from operating Clarksville America's Best Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

**c.** This venture violated 18 U.S.C. §1591(a) through the conduct of JRD Partnership and the widespread sex trafficking at Clarksville America's Best Inn.

**d.** Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), The AB Brand Defendants participated in the venture by continuing to associate with JRD Partnership to operate Clarksville

35

America's Best Inn in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe T.W.

e. Jane Doe T.W.'s trafficking at Clarksville America's Best Inn was a result of The AB Brand Defendants' and JRD Partnership's facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at Clarksville America's Best Inn. Had The AB Brand Defendants not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe T.W.'s trafficking at Clarksville America's Best Inn.

**F. JRD Partnership and the staff at Clarksville America's Best Inn acted as actual agents of the AB Brand Defendants.**

104. The AB Brand Defendants are vicariously liable for the acts, omissions, and knowledge of JRD Partnership and the staff at Clarksville America's Best Inn, which are the AB Brand Defendants' actual agents or subagents.

105. The AB Brand Defendants exercised pervasive and systematic control of Defendant JRD Partnership regarding the operation of the subject Clarksville America's Best Inn.

106. At all relevant times, Defendant JRD Partnership acted as the agent of the AB Brand Defendants when operating the Clarksville America's Best Inn.

107. At all relevant times, JRD Partnership was subject to and required to comply with franchise agreement standards, policies, and rules adopted by the AB Brand Defendants. These standards and policies are detailed and control the specific manner and means by which Defendant JRD Partnership must operate the subject Clarksville America's Best Inn.

108. The AB Brand Defendants require franchisees, such as JRD Partnership, to allow the AB Brand Defendants to regularly inspect its Clarksville America's Best Inn branded hotels.

109. The AB Brand Defendants regularly inspected Clarksville America's Best Inn.

110. The AB Brand Defendants subjected JRD Partnership to detailed standards and requirements regarding the operation of Clarksville America's Best Inn through the franchising

36

agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by The AB Brand Defendants. These written standards, protocols, and requirements:

      **a.** did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools JRD Partnership used at Clarksville America's Best Inn; and

      **b.** covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

      **c.** dictated the specific manner in which JRD Partnership and hotel staff must carry out most day-to-day functions at Clarksville America's Best Inn; and

      **d.** significantly exceeded what was necessary for the AB Brand Defendants to protect registered trademarks.

111.  The AB Brand Defendants specifically retained control of the day-to-day operation of Defendant JRD Partnership with regard to aspects of operation of the subject Clarksville America's Best Inn that caused T.W.'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education policies, and procedure regarding human trafficking.

112.  The AB Brand Defendants regularly advised JRD Partnership on operational changes necessary for it to remain in compliance with the AB Brand Defendants' strict regulations.

113.  The AB Brand Defendants had the ability to impose fees or fines on JRD Partnership. Furthermore, at all material times, the AB Brand Defendants retained an absolute right to cancel the franchise agreement with JRD Partnership if the AB Brand Defendants' rules were violated or if JRD Partnership otherwise failed to comply with its contractual obligations.

114.  The AB Brand Defendants and Defendant JRD Partnership shared control of the terms and conditions of the employment of staff at the subject Clarksville America's Best Inn and,

therefore, Defendant the AB Brand Defendants and Defendant JRD Partnership are joint employers. Upon information and belief, the AB Brand Defendants exercised control over the terms and conditions employment of staff at the subject Clarksville America's Best Inn by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

115.     In addition to the ways described above, upon information and belief, the AB Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over JRD Partnership's day-to-day operation of the Clarksville America's Best Inn, including the following ways:

a.  requiring the franchisee and hotel staff to keep detailed records of the day-to-day operations of the hotel;

b.  requiring the franchisee and hotel staff to submit detailed reports on aspects of day-to-day operations;

c.  requiring the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis;

d.  exercising or retaining control over vendors that franchisees can use to procure supplies for day-to-day operations;

e.  dictating the specific tools that franchisee and hotel staff must use to perform day-to-day operations of the hotel;

f.  requiring franchisees to use specific complaint resolution programs;

g.  dictating the response of franchisees to specific complaints;

h.  exercising or retaining control over the franchisee's day-to-day accounting and banking practices;

i.  requiring franchisees to participate in mandatory marketing and advertising programs;

j.  exercising sole control over a website for the hotel property and prohibiting franchisee from using any other website for the hotel property;

k.  restricting the franchisee's ability to contract out the work of operating the hotel and retaining control over the franchisee's ability to use a management company or other third-party contractor;

l.  exercising or retaining control over all aspects of building and facility design;

m.  reserving the right to order upgrades and improvements to facilities and operations at the hotel;

n.  retaining control over all in-room services, including whether and under what conditions adult movie should be offered;

o.  retaining the right to use meeting rooms and other space at the hotel property to conduct meetings and other business;

p.  publicly labeling hotel employees as "our staff" or "our hotel staff";

q.  exercising or retaining control over human resources issues at the hotel property;

r.  posting jobs for its branded properties;

s.  providing benefits to staff of its branded properties;

t.  setting parameters and guidelines for mandatory evaluations of hotel staff;

u.  setting pay, pay parameters, or pay ranges for hotel staff;

v.  setting job qualifications for hotel staff;

w.  setting job descriptions for hotel staff;

x.  adopting policies that specifically dictate which positions must perform which day-to-day functions;

y.  dictating staffing levels required at hotels;

z.  making or influencing hiring decisions for hotel staff;

aa.  providing or controlling onboarding for hotel staff;

bb.  exercising or retaining control over standardized training for hotel employees and management;

39

cc. controlling the time, manner, and location of training for franchisees and hotel staff;

dd. requiring all management personnel to attend franchisor led training;

ee. exercising or retaining control over training for front desk, housekeeping and operational staff;

ff. retaining sole discretion to determine whether franchisee and hotel staff have satisfactorily completed training;

gg. adopting policies that dictate specific disciplinary steps for specific infractions by hotel staff;

hh. maintaining employment records, including training records, for hotel staff

ii. establishing employee recognition programs for hotel staff;

jj. requiring that franchisee maintain specific levels of insurance and list the franchisor as an additional insured;

kk. retaining sole discretion to transfer the franchising agreement to any person or entity without notice but prohibiting franchisee from transferring the agreement without the franchisor's consent.

116.    Upon information and belief, the AB Brand Defendants had the right to and did enforce its control over JRD Partnership through various methods, including:

a. the right to conduct detailed inspections of the Clarksville America's Best Inn;

b. monitoring or auditing the JRD Partnership for compliance with policies and expectations;

c. directing JRD Partnership to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

40

g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services;

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations;

## G. Relationships among the AB Brand Defendants.

117. Vantage is responsible, as a successor, for the acts and omissions of its predecessors, including AB Franchising, with respect to operation, franchising, and control of the Clarksville America's Best Inn.

118. Upon information and belief, in 2014, Vantage, directly and through its wholly owned and controlled subsidiaries, began managing America's Best hotels and subsequently acquired the America's Best brand and hotel business from AB Franchising. This business included the franchising, control, and operation of the Clarksville America's Best Inn. Vantage, directly or through subsidiaries, continued to operate all or substantially all the hotel business formerly operated by AB Franchising and its subsidiaries, including the franchising, control, and operation of the Clarksville America's Best Inn.

119. Upon information and belief, Vantage agreed to assume responsibility for liabilities of AB Franchising and its former subsidiaries regarding the franchising, control, and operation of the Clarksville America's Best Inn.

120. Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Clarksville America's Best Inn were shared and fulfilled

41

jointly by the AB Brand Defendants. Upon information and belief, each of the AB Brand Defendants shared revenue related to operation, franchising, and control of the Clarksville America's Best Inn and each of the AB Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Clarksville America's Best Inn. Upon information and belief, each of the AB Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Clarksville America's Best Inn in the ways outlined more specifically above. Further, upon information and belief, each of the AB Brand Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

121.    Upon information and belief, each of the AB Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Clarksville America's Best Inn. The AB Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Clarksville America's Best Inn.

V.    **Sex Trafficking at the Clarksville Days Inn**

A. **The Wyndham Brand Defendants and Days Inn Franchisee Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Clarksville Days Inn.**

122.    The Wyndham Brand Defendants and Days Inn Franchisee Defendants were specifically aware that sex trafficking was widespread and ongoing at the Clarksville Days Inn.

123.    Online reviews of the Clarksville Days Inn, which upon information and belief were monitored by the Wyndham Brand Defendants and Days Inn Franchisee Defendants, establish the nature of the Clarksville Days Inn's role as a venue for sex trafficking:

42

a. Trip Advisor review from 2014: "*It reminded me of a brothel with all the activity next door.*"[70]

b.  Google review dated 6 years ago: *"this hotel is for drug people and ladies of the night."* – Penny Mullin[71]

c. Google review dated 10 months ago: *"Women walking around looking for some action."* – Laura Williams

d. Booking.com review dated September 29, 2021 – *"The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings."* - Peggy[72]

124.    The Wyndham Brand Defendants and Days Inn Franchisee Defendants also knew or should have known about the sex trafficking pervasive at the Clarksville Days Inn based on obvious indicators of this activity.

125.    Traffickers, including Jane Doe T.W.'s traffickers, repeatedly chose to use this Days Inn for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking.

126.    There were obvious and apparent signs of this widespread trafficking activity, consistent with the well-known "red flags" of sex trafficking in the hospitality industry, that the Defendants knew or should have known about. Apparent indicia of widespread and ongoing sex trafficking at the Clarksville Days Inn included:

---

[70] https://www.tripadvisor.com/Hotel_Review-g54955-d105760-Reviews-or70-Days_Inn_by_Wyndham_Clarksville_TN-Clarksville_Tennessee.html#REVIEWS
[71] https://www.google.com/travel/search?q=days%20inn%201100%20highway%2076%20clarksville%20tn&g2lb=2502548%2C2503771%2C2503781%2C4258168%2C4270442%2C4284970%2C4291517%2C4308227%2C4597339%2C4757164%2C4814050%2C4850738%2C4864715%2C4874190%2C4886480%2C4893075%2C4924070%2C4963887%2C4965990%2C4990494%2C72246918%2C72248281%2C72254357%2C72262103%2C72271797%2C72278630%2C72279098%2C72286089%2C72289744%2C72291819%2C72294114%2C72294115%2C72296743&hl=en-US&gl=us&ssta=1&ts=CAESABpGCigSJjIkMHg4ODY0ZGUyZjZkZTc4M2FkOjB4N2JmZDYwMTUxNTg4NmNmEhoSFAoHCOcPEAcYGRIHCOcPEAcYGhgBMgIQAA&qs=CAEyE0Nnb0l6NDNpaXBYYQTlkOEhFQUU4AkILCc-GWFEB1r8HGAFCCwnPhlhRAda_BxgB&ap=ugEHcmV2aWV2cw&ictx=1&sa=X&ved=0CAAQ5JsGahcKEwjglY3j8Oj_AhUAAAAAHQAAAAAQCw (last visited June 29, 2023)
[72] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

43

     **a.**   There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays.

     **b.**   There was widespread drug trade at the hotel, which is closely linked to human trafficking.

     **c.**   There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution.

     **d.**   Rooms used by the traffickers were regularly observed to be mess, to contain excessive sex and drug paraphernalia, and to have an unclean smell.

127.   Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Clarksville Days Inn prior to Jane Doe T.W.'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

128.   All knowledge from the staff at Days Inn is imputed to Days Inn Franchisee Defendants. Days Inn Franchisee Defendants knew about this widespread and ongoing trafficking at Days Inn, including the trafficking of Jane Doe T.W., through the direct observations of hotel staff, including management-level staff.

129.     Upon information and belief, the Wyndham Brand Defendants knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because they:

    a.   conducted regular inspections of the hotel property;

    b.   employed "field agents" to work with hotels on trafficking issues;

    c.   publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

    d.   required franchisee and hotel staff to report suspected trafficking activity to Franchisor;

    e.   was involved in day-to-day consulting on operational issues at hotel;

    f.   had access to surveillance systems;

    g.   collected and monitored data that showed patterns consistent with trafficking;

    h.   participated in internal investigations;

    i.   solicited and received customer feedback and complaints;[73]

130.     Upon information and belief, the Wyndham Brand Defendants adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to the Wyndham Brand Defendants. Based on the existence of this protocol and the widespread and obvious trafficking at the Clarksville Days Inn, there were multiple instances of suspected sex trafficking that were reported to the Wyndham Brand Defendants.

---

[73] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint, monitored the response, and tried to placate disgruntled guests with Wyndham Rewards hotel points.")

131.    The Wyndham Brand Defendants and the Days Inn Franchisee Defendants had constructive knowledge of the widespread and ongoing trafficking at the Clarksville Days Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel.

**B.  The activities of Jane Doe T.W.'s trafficker at the Clarksville Days Inn were apparent and obvious.**

132.    During the 30-month period that Jane Doe T.W. was trafficked at Days Inn, there were obvious signs that her traffickers were engaged in sex trafficking.

> **a.**  There was constant and heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had approximately 15 men per day sexually exploiting her at Days Inn.
>
> **b.**  Men sexually exploiting Jane Doe entered and left her room at unusual times and stayed for brief periods.
>
> **c.**  Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras.
>
> **d.**  Jane Doe's traffickers would decline room service for several consecutive days.
>
> e.  There were other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel, including but not limited to those described above.

133.    Based upon information and belief, multiple employees at the Clarksville Days Inn, including management-level employees, observed, or were made aware of these obvious signs of Jane Doe's trafficking while acting within the scope and course of their employment. Based on this and on the above-listed methods that it used to monitor and supervise the Clarksville Days Inn, Days Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe was being trafficked.

134.    Given these obvious signs, the Wyndham Brand Defendants knew or should have known about the trafficking of Jane Doe T.W. based on its policy or protocol that required hotel staff to report suspected trafficking.

135.    The Wyndham Brand Defendants also knew or should have known about Jane Doe T.W.'s trafficking based on the above-listed methods that it used to monitor and supervise the Clarksville Days Inn.

136.    The Wyndham Brand Defendants and Days Inn Franchisee Defendants had constructive knowledge of the trafficking of Jane Doe T.W. at Days Inn because that trafficking was the direct result of the Wyndham Brand Defendants and Days Inn Franchisee Defendants facilitating trafficking at Days Inn.

**C. Days Inn Franchisee Defendants facilitated the trafficking activity at Days Inn, including the trafficking of Jane Doe T.W.**

137.    Days Inn Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the Days Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Days Inn Franchisee Defendants ratified these acts and omissions, and because Days Inn Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Days Inn Franchisee Defendants, of human trafficking occurring in the Days Inn.

138.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, Days Inn Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

139.    Days Inn Franchisee Defendants knew or were willfully blind to the fact that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her

traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe T.W.'s sexual exploitation.

140. Days Inn Franchisee Defendants also facilitated widespread trafficking at Days Inn, including the trafficking of Jane Doe T.W., in ways including:

    a. Accommodating specific requests of the traffickers for room location.

    b. Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

    c. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**D. Wyndham facilitated the trafficking activity at the Clarksville Days Inn, including the trafficking of Jane Doe T.W.**

141. Wyndham directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

    **a.** controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

    b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

    **c.** requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

    **d.** reserving rooms and accept payments without requiring franchisee approval or involvement;

    **e.** controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

    **f.** requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

    **g.**  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

    **h.**  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

    **i.**  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

    **j.**  ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

    k.  exercising control over the price of rooms;

    l.  controlling all details of the customer loyalty program that the franchisee was required to implement;

    m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

    **n.**  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

    **o.**  assuming sole ownership over all guest information;

    **p.**  overseeing do not rent (DNR) lists for its branded properties.

142. Wyndham directly participated in and retained control over aspects of the operation of Days Inn related to trafficking by:

    a.  assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

    b.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

    c.  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

**g.** establishing systems for guests to report security issues to franchisor;

**h.** requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

143. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Clarksville Days Inn, the Wyndham Brand Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

144. The Wyndham Brand Defendants knew or should have known that Jane Doe T.W. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe T.W.'s sexual exploitation.

145. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Days Inn, the Wyndham Brand Defendants continued operating Days Inn together with Days Inn Franchisee Defendants in a way that it knew or should have known would result in facilitating additional sex trafficking at Days Inn, including by:

50

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking;

146. If the Wyndham Brand Defendants had exercised reasonable diligence when operating the Clarksville Days Inn, the Wyndham Brand Defendants would have prevented the Days Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W. Instead, the Wyndham Brand Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe T.W.

147. Each Defendant directly benefited from facilitating trafficking at the Clarksville Days Inn. Each Defendant received monetary payment for the rental of rooms at the Clarksville Days Inn, including the rooms where Jane Doe T.W. was being trafficked:

51

a. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Clarksville Days Inn. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement and pursuant to agreements among themselves, the Wyndham Brand Defendants received a share of the profits from room rentals collected at the Clarksville Days Inn. The primary source of the Wyndham Brand Defendants' income is the franchising royalty fee, but the Wyndham Brand Defendants also profited from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increase with each room rental at the subject Clarksville Days Inn.

b. The Days Inn Franchisee Defendants profited from every stay by every patron at the Clarksville Days Inn, both from room rentals and other hotel services.

**E. Defendants' ventures at the Clarksville Days Inn.**

148.     Through the conduct described above, the Wyndham Brand Defendants and Days Inn Franchisee Defendants knowingly benefited from engaging in a venture with sex traffickers at Days Inn, including Jane Doe T.W.'s traffickers, as follows:

a. Each of the Wyndham Brand Defendants and Days Inn Franchisee Defendants received benefits, including increased revenue, every time a room was rented at Days Inn.

b. This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at Days Inn, which the Wyndham Brand Defendants and Days Inn Franchisee Defendants knew or should have known about.

c. The Wyndham Brand Defendants and Days Inn Franchisee Defendants associated with traffickers, including Jane Doe T.W.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. The Wyndham Brand Defendants and Days Inn Franchisee Defendants had a mutually beneficial relationship with the traffickers at Days Inn, fueled by sexual exploitation of victims.

e. Sex traffickers, including Jane Doe T.W.'s traffickers, frequently used Days Inn for their trafficking because of an implicit understanding that Days Inn was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the

52

conduct of the Wyndham Brand Defendants and Days Inn Franchisee Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for the Wyndham Brand Defendants and Days Inn Franchisee Defendants.

f. Both the Wyndham Brand Defendants and Days Inn Franchisee Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. Jane Doe T.W.'s trafficking at Days Inn was a result of the Wyndham Brand Defendants and Days Inn Franchisee Defendants' participation in a venture with criminal traffickers. If the Wyndham Brand Defendants and Days Inn Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe T.W.'s trafficking at Days Inn.

149. Through the conduct described above, the Wyndham Brand Defendants also knowingly benefited from engaging in a venture with Days Inn Franchisee Defendants operating the Clarksville Days Inn as follows:

a. The Wyndham Brand Defendants and Days Inn Franchisee Defendants to operate the Clarksville Days Inn.

b. Pursuant to the terms of the franchising agreement, both the Wyndham Brand Defendants and Days Inn Franchisee Defendants received financial benefits from operating Days Inn, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §1591(a) through the conduct of Days Inn Franchisee Defendants and the widespread sex trafficking at Days Inn.

d. Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), the Wyndham Brand Defendants participated in the venture by continuing to associate with Days Inn Franchisee Defendants to operate Days Inn in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe T.W.

e. Jane Doe T.W.'s trafficking at Days Inn was a result of the Wyndham Brand Defendants' and Days Inn Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at the Clarksville Days Inn. Had Wyndham not continued participating in a venture that it knew or should have

53

known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe T.W.'s trafficking at the Clarksville Days Inn.

**F. Days Inn Franchisee Defendants and the staff at the Clarksville Days Inn acted as actual agents of the Wyndham Brand Defendants.**

150.     The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Days Inn Franchisee Defendants and staff at Days Inn, which are the Wyndham Brand Defendants' actual agents or subagents.

151.     The Wyndham Brand Defendants subjected Days Inn Franchisee Defendants to detailed standards and requirements regarding the operation of Days Inn through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Brand Defendants. These written standards, protocols, and requirements:

> **a.**   did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Days Inn Franchisee Defendants used at Days Inn; and
>
> **b.**   covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and
>
> **c.**   dictated the specific manner in which Days Inn Franchisee Defendants and hotel staff must carry out most day-to-day functions at Days Inn; and
>
> **d.**   significantly exceeded what was necessary for the Wyndham Brand Defendants to protect their registered trademarks.

152.     The Wyndham Brand Defendants obscured the full extent of control it exercises over franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.

153.     In addition to the ways described above, upon information and belief, the Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over

Days Inn Franchisee Defendants' day-to-day operation of the Days Inn, including the following ways:

    a. The Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Brand Defendants to protect their registered trademarks;

    b. The Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. The Wyndham Brand Defendants provided training for hotel management and select hotel staff on-site at the Clarksville Days Inn and at locations selected by the Wyndham Brand Defendants;

    c. The Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, they controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

    d. The Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

    e. The Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

    f. The Wyndham Brand Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

    g. The Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

    h. For certain products and services that franchisee was required to purchase to operate the Clarksville Days Inn, the Wyndham Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

    i. The Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

55

j.  The Wyndham Brand Defendants set required staffing levels for the Clarksville Days Inn;

k.  The Wyndham Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  The Wyndham Brand Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  The Wyndham Brand Defendants provided benefits for employees of franchised hotels;

n.  The Wyndham Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Clarksville Days Inn and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Days Inn Franchisee Defendants to pay associated costs;

o.  The Wyndham Brand Defendants generated reports and analysis of guest complaints and online reviews for the Clarksville Days Inn;

p.  The Wyndham Brand Defendants set detailed requirements for insurance that Days Inn Franchisee Defendants must purchase;

q.  The Wyndham Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r.  The Wyndham Brand Defendants regularly audited the books and records of Days Inn Franchisee Defendants;

s.  The Wyndham Brand Defendants conducted frequent and unscheduled inspections of the Clarksville Days Inn;

t.  The Wyndham Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of the Wyndham Brand Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Clarksville Days Inn;

56

u. The Wyndham Brand Defendants controlled all marketing for the Clarksville Days Inn, directly provided marketing services, and prohibited Days Inn Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v. The Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design;

w. The Wyndham Brand Defendants imposed detailed recordkeeping and reporting requirements on Days Inn Franchisee Defendants regarding virtually all aspects of hotel operations;

x. The Wyndham Brand Defendants supervised and controlled day-to-day operations of the Clarksville Days Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Days Inn Franchisee Defendants to use;

y. The Wyndham Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. The Wyndham Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

154. Upon information and belief, the Wyndham Brand Defendants had the right to and did enforce its control over Days Inn Franchisee Defendants through various methods, including:

a. the right to conduct detailed inspections of the Clarksville Days Inn;

b. monitoring or auditing the Days Inn Franchisee Defendants for compliance with policies and expectations;

c. directing Days Inn Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d. mandating training and education for franchisees and/or hotel staff;

e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f. the right to impose fines or penalties;

57

g.  the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h.  the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

## G. Relationships among the Wyndham Brand Defendants.

155.  WHR is responsible, as a successor, for the acts and omissions of its predecessors (including Wyndham Worldwide Corporation and its subsidiaries) with respect to operation, franchising, and control of the Clarksville Days Inn.

156.  Prior to 2018, an entity known as Wyndham Hotels and Resorts was a private company (referred to herein as "predecessor WHR") that was a wholly owned subsidiary of Wyndham Worldwide Corporation. In 2018, Wyndham Worldwide Corporation approved a spin-off of its wholly owned subsidiary, predecessor WHR, to form a public company for the continued operation of the Wyndham hotel business that had previously been conducted by Wyndham Worldwide Corporation and/or its wholly owned subsidiaries. This business included the franchising, control, and operation of the Clarksville Days Inn. This public company that resulted from this spin-off was Defendant WHR.

157.  Defendant WHR and its wholly owned subsidiaries continued to operate all or substantially all the hotel business formerly operated by Wyndham Worldwide Corporation and its subsidiaries, including the franchising, control, and operation of the Clarksville Days Inn.

158.  Upon information and belief, WHR agreed to assume responsibility for liabilities of Wyndham Worldwide Corporation and its former subsidiaries regarding the franchising, control, and operation of the Clarksville Days Inn.

159.  Upon information and belief, the rights, and obligations with respect to the operation, franchising, and control of the Clarksville Days Inn were shared and fulfilled jointly by

58

the Wyndham Brand Defendants. Upon information and belief, each of the Wyndham Brand Defendants shared revenue related to operation, franchising, and control of the Clarksville Days Inn and each of the Wyndham Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the Clarksville Days Inn. Upon information and belief, each of the Wyndham Brand Defendants participated directly in the ventures franchising, controlling, operating, and renting rooms at the Clarksville Days Inn in the ways outlined more specifically above. Further, upon information and belief, each of the Wyndham Defendants knew or should have known that these ventures were engaged in facilitation of sex trafficking.

160. Upon information and belief, each of the Wyndham Brand Defendants participated in a joint venture regarding the operation, control, and franchising of the Clarksville Days Inn. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture with respect to the operation, franchising, and control of the Clarksville Days Inn.

## VI. Defendants are Jointly and Severally Liable for Jane Doe's Damages

161. The venture or ventures in which each Defendant participated were proximate causes of the injuries and damages to Jane Doe T.W. and were direct causes and/or substantial factors in causing those injuries and damages.

162. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe T.W. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

59

## I. Cause of Action 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)

163.    Jane Doe T.W. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

164.    Each of the Franchisee Defendants is a perpetrator within the meaning of 18 U.S.C §1595(a) because each of the Franchisee Defendants:

    **a.**    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe T.W.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

    **b.**    violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

## II. Cause of Action 2: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants)

165.    Jane Doe T.W. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

166.    Through acts and omissions described throughout this Complaint, each of the Franchisor Defendants and each of the Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe T.W.'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe T.W.'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus,

each of the Franchisor Defendants and each of the Franchisee Defendants is liable as a beneficiary under 18 U.S.C §1595(a).

167.    Through the acts and omissions described throughout this Complaint, each of the Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisee regarding the operation of its respective hotel property despite the fact that each Franchisor Defendant knew or should have known that this venture was violating 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2).

168.    Violations of 18 U.S.C §1595(a) by each of the Franchisor Defendants and each of the Franchisee Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe T.W. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## III.    Cause of Action 3: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

169.    Each of the Franchisee Defendants acted as the actual agent of its respective Franchisor Defendant when operating its respective hotel property.

170.    Each of the Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its respective hotel property.

171.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

172.    Each of the Franchisor Defendants is vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

61

173.     As alleged above, JRD Partnership is directly liable to Jane Doe T.W. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The AB Brand Defendants are also directly liable to Jane Doe T.W. under § 2255. The AB Brand Defendants are vicariously liable to Jane Doe T.W. for those same violations.

174.     As alleged above, Days Inn Franchisee Defendants are directly liable to Jane Doe T.W. for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Wyndham is also directly liable to Jane Doe T.W. under § 2255. Wyndham is vicariously liable to Jane Doe T.W. for those same violations.

175.     Each of the AB Brand Defendants is liable for the acts and omissions of each of the other AB Brand Defendants with respect to the operation and franchising of the Clarksville America's Best Inn. On information and belief, the AB Brand Defendants, who were corporate affiliates subject to common ownership and control, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Clarksville America's Best Inn. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Clarksville America's Best Inn.

176.     Each of the Wyndham Brand Defendants is liable for the acts and omissions of each of the other Wyndham Brand Defendants with respect to the operation and franchising of the Clarksville Days Inn. On information and belief, the Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Clarksville Days Inn. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Clarksville Days Inn.

62

IV. **Cause of Action 4: Franchisor's Vicarious Liability for Franchisee's Violations of the TVPRA as Joint Employer of the Staff at the subject Clarksville America's Best Inn and Days Inn**

177. At all relevant times, the AB Brand Defendants and JRD Partnership were joint employers of the staff of the Clarksville America's Best Inn because they exercised joint control over the terms and conditions of employment, and economic realities reflect joint employment.

178. Under the TVPRA and the federal common law, the AB Brand Defendants, as a joint employer of the staff of the subject Clarksville America's Best Inn, are vicariously liable for the acts and omissions of the staff of the subject Clarksville America's Best Inn.

179. As alleged above, the staff of the subject Clarksville America's Best Inn engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). The AB Brand Defendants are vicariously liable for these TVPRA violations.

180. At all relevant times, Wyndham and Days Inn Franchisee Defendants were joint employers of the staff of the subject Days Inn because they exercised joint control over the terms and conditions of employment, and economic realities reflect joint employment.

181. Under the TVPRA and the federal common law, Wyndham, as a joint employer of the staff of the subject Clarksville America's Best Inn, is vicariously liable for the acts and omissions of the staff of the subject Days Inn.

182. As alleged above, the staff of the subject Days Inn engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). Wyndham is vicariously liable for these TVPRA violations.

## **TOLLING OF LIMITATIONS**

183. To the extent Defendants assert an affirmative defense of limitations, Jane Doe T.W. invokes the discovery rule. At the time she was harmed and through at least October 2014, Jane

63

Doe T.W. was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe T.W. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe T.W. —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of Jane Doe T.W. but rather was a direct result of Jane Doe T.W. being kept under the control of her traffickers, which Defendants facilitated.

184.　At the time Jane Doe T.W. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed..

185.　To the extent Defendants assert an affirmative defense of limitations, Jane Doe T.W. invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe T.W. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe T.W. filed this lawsuit.

186.　To the extent Defendants assert an affirmative defense of limitations, Jane Doe T.W. also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct. Jane Doe T.W. was subject to continuous trafficking at Defendants' hotels through at least October 2014, which is not more than 10 years before Jane Doe (S.A.S.) filed this lawsuit. This continuous trafficking resulted from Defendants' continuous facilitating of

trafficking at the subject Motel 6s and Defendants' ongoing venture with one another and with criminal traffickers.

**DAMAGES**

187.    Jane Doe T.W. seeks the following damages, joint and severally, from all Defendants:

      a.  Actual damages;

      b.  Direct damages;

      c.  Incidental and consequential damages;

      d.  Mental anguish and emotional distress damages (until trial and in the future)

      e.  Lost earnings and lost earning capacity;

      f.  Loss of self-esteem and self-worth;

      g.  Necessary medical expenses;

      h.  Physical pain and suffering;

      i.  Physical impairment;

      j.  Emotional impairment;

      k.  Unjust enrichment;

      l.  Exemplary/Punitive damages;

      m.  Attorneys' fees;

      n.  Costs of this action; and

      o.  Pre- and post-judgment interest at the maximum legal rates.

188.    Jane Doe T.W. is entitled to treble damages.

189.    A constructive trust should be imposed on all Defendants and the Court should sequester any benefits or money wrongfully received by all Defendants for the benefit of Jane Doe T.W.

## JURY DEMAND

190.    Jane Doe (T.W.) requests a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Jane Doe (T.W.) requests that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (T.W.) against all Defendants jointly and severally for such actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (T.W.) may be justly entitled.

Respectfully submitted,

/s/ Michael Hamilton
Michael Hamilton (BPR # 010720)
**PROVOST★UMPHREY LAW FIRM LLP**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
615.297.1932 – phone
615.297.1986 – fax
mhamilton@pulf.com

Guy G. Fisher
**PROVOST★UMPHREY LAW FIRM LLP**
350 Pine Street, Ste. 1100
Beaumont, Texas 77701
409.835.6000 – phone
409.813.8625 – fax

66

gfisher@pulf.com

**ANNIE MCADAMS, PC**
ANNIE MCADAMS
1150 Bissonnet
Houston, TX 77005
713.785.6262 - phone
866.713.6141 - fax
annie@mcadamspc.com

*Attorneys for Plaintiff*

### Certificate of Service

I hereby certify that on December 12, 2023 a copy of the forgoing was served on the following counsel of record through the Court's ECF system.

Kathryn Skagerberg
Nelson Mullins Riles & Scarborough LLP
1222 Demonbreun Street
Suite 1700
Nashville, TN 37203
(615) 664-5351
Kate.skagerberg@nelsonmullins.com

Laurence M. McMillan, Jr..
Mitchell, Ross, Rocconi &McMillan, PLLC
308 S. 2nd Street
Clarksville, TN 37040
(931) 552-1480
lmcmillan@cunninghammitchell.com

Dave S. Sager
DLA Piper LLP
51 John F. Kennedy Parkway, Suite 120
Short Hills, NJ 07078
david.sager@us.dlapiper.com

Christopher B. Donovan
DLA Piper LLP
845 Texas Avenue, Suite 3800
Houston, TX 77002
christopher.b.donovan@us.dlapiper.com

/s/ Michael Hamilton
Michael Hamilton